# EXHIBIT 1

Rod N. Andreason (Utah Bar No. 8853)
Adam D. Wahlquist (Utah Bar No. 12269)
**KIRTON McCONKIE**
50 East South Temple, Suite 400
P.O. Box 45120
Salt Lake City, UT 84145-0120
Telephone: (801) 328-3600
randreason@kmclaw.com
awahlquist@kmclaw.com

*Attorneys for Plaintiffs*

---

## IN THE THIRD JUDICIAL DISTRICT COURT

## SALT LAKE COUNTY, STATE OF UTAH

| | |
|---|---|
| MAIKOLO IKA and BRODI IKA, | **COMPLAINT** |
| Plaintiffs, | Civil No. _____ |
| v. | **<u>Tier 3</u>** |
| WRIGHT MEDICAL GROUP, INC., a Delaware corporation, and WRIGHT MEDICAL TECHNOLOGY, INC., a Delaware corporation, | **Jury Trial Requested** |
| Defendants. | |

Plaintiffs Maikolo IKA and Brodi IKA (collectively, "Plaintiffs") allege and complain

against Defendants Wright Medical Group, Inc. and Wright Medical Technology, Inc.

(collectively, "Wright") as follows:

### <u>INTRODUCTION</u>

1.     Upon information and belief, Wright's Conserve Hip Implant System, a metal-on-

metal hip-replacement product, was rushed to market with limited testing and bypassing

regulatory safeguards. Wright knew that previously attempted metal-on-metal hip replacement prostheses had failed in the 1960s and 1970s. It also knew, by no later than 1995, that metal debris, corrosion and ions resulting from the movement of a metal-on-metal hip joint can cause adverse local tissue reactions, inflammation, pseudotumors, osteolysis, and bone and tissue necrosis, among other problems, leading to the failure of the prosthesis and revision surgery. Nonetheless, in an attempt to capture market share and profits over its competitors, Wright aggressively marketed the Conserve Hip Implant System. Wright designed a marketing campaign aimed at orthopaedic surgeons with the goal of downplaying the dangers of metal ions—a campaign that provided information directly contrary to Wright's own knowledge. And, despite Wright's knowledge that an increase in activity level for patients with metal-on-metal hip implants also increased the production of metal debris, it marketed the Conserve Hip Implant System as safe and appropriate for use in active patients with physically demanding jobs, like Plaintiff Maikolo Ika.

2.      Moreover, upon information and belief, despite the fact that the Conserve thin shell was not cleared for marketing by the FDA until 2012, Wright aggressively marketed it as a component of the Conserve Hip Implant System. Wright did so for almost a decade, under an internal letter to file, instead of via regulatory approval or clearance procedure through the United States Food and Drug Administration (the "FDA").

3.      Upon information and belief, when Wright received complaints about metalosis, adverse local tissue reactions, inflammation, pseudotumors, osteolysis, and bone and tissue necrosis, coupled with early failure of the Conserve Hip Implant System, it ignored them or

blamed the implanting surgeons, and continued promoting and selling the Conserve Hip Implant System.

4.      As a result of Wright's aggressive and misleading marketing, failure to follow FDA requirements and failure to acknowledge and warn surgeons, patients, and the public about known problems with metal-on-metal hip replacements in general and the Conserve Hip Implant System in particular, Plaintiff Maikolo Ika and many others received defective and unreasonably dangerous Conserve Hip Implant Systems. He, like other patients who received these defective medical devices, has endured unnecessary pain and suffering, debilitating lack of mobility, inflammation, metalosis, toxicity, device failure, and a subsequent more difficult revision surgery to replace the defective Conserve Hip Implant System, giving rise to additional pain and suffering, prolonged recovery time, and unnecessary complications from the revision surgery.

## PARTIES, JURISDICTION, AND VENUE

5.      Plaintiffs Maikolo and Brodi Ika have, at all relevant times, been married to each other. They have, again at all relevant times, resided in Sandy, Salt Lake County, Utah.

6.      Defendant Wright Medical Group, Inc. ("Wright Group") is a corporation organized under the laws of the State of Delaware, with its principal place of business located in Memphis, Tennessee.

7.      At all relevant times, Defendant Wright Group regularly conducted business throughout the United States, in the State of Utah, and in Salt Lake County, Utah.

8.      Defendant Wright Medical Technology, Inc. ("Wright Technology") is a corporation organized under the laws of the State of Delaware, with its principal place of business in Memphis, Tennessee.

9.      At all relevant times, Wright Technology regularly conducted business throughout the United States, in the State of Utah, and in Salt Lake County, Utah.

10.      The events giving rise to this dispute occurred in Salt Lake County, Utah.

11.      This Court has jurisdiction over this case pursuant to Utah Code § 78A-5-102(1).

12.      Venue is proper within this Court pursuant to Utah Code § 78B-3-307(1) and (3).

13.      This case falls under Tier 3 for standard discovery purposes as the amount of damages is more than $300,000.00.

## BACKGROUND

14.      Plaintiff Maikolo Ika ("Mike") was implanted on June 18, 2007, with a defective and unreasonably dangerous Wright Conserve Hip Implant System that Defendants designed, manufactured, marketed, distributed, and sold.

15.      The hip joint is where the femur connects to the pelvis. The joint is made up of the femoral head (a ball-like structure at the top of the femur), rotating within the acetabulum (a cup-like structure at the bottom of the pelvis). In a healthy hip, both the femur and the acetabulum are strong, and the rotation of the bones against each other is cushioned and lubricated by cartilage and fluids. Over time, age and wear can break down the cartilage, causing the bone of the femur to rub directly against the bone of the acetabulum, sometimes resulting in pain and/or immobility.

16.      A total hip replacement replaces the body's natural joint with an artificial one, usually made out of metal or ceramic and plastic. A typical total hip replacement system consists of four separate components: (1) a femoral stem, (2) a femoral head, (3) an acetabular shell, and (4) a liner. To replace a patient's hip joint, a surgeon hollows out a patient's femur bone and

4847-6620-3389.v1

implants a femoral stem. Then a metal ball is fixed on top of the femoral stem to become the new femoral head. The surgeon also reams out the acetabulum and fits an artificial acetabular shell into the bone. Then, prior to the utilization of metal-on-metal hip replacement systems like the Wright Conserve Hip Implant System, a liner made of polyethylene would be inserted into a titanium acetabular shell, and the new femoral head (made of metal or ceramic) would rotate inside the shell, creating a metal-on-polyethylene or ceramic-on polyethylene articulation.

17.     Upon information and belief, the Conserve Hip Implant System is a design that omits the polyethylene liner and instead puts the Cobalt-Chromium metal Conserve femoral ball directly in contact with a Cobalt-Chromium metal Conserve acetabular cup. The movement of this artificial joint produces metal-on-metal wear debris, and the amount of toxic metal debris produced increases as a patient's activity increases.

18.     Upon information and belief, the Conserve Hip Implant System and related components were cleared for marketing by the FDA, not at the time the device was marketed and sold, but after Wright was faced with hundreds of claims.

19.     Upon information and belief, the Conserve Hip Implant System, which was implanted in Mike in 2007, was not cleared for marketing until 2012. Prior to that time, it was sold pursuant to an internal Wright letter to file that Wright knew was inappropriate and in violation of FDA requirements.

20.     A medical device submitted under the Section 510(k) process of the Food, Drug and Cosmetic Act does not have to go through the rigors of a clinical study to gain clearance from the FDA.

21.     Upon information and belief, certain Wright Conserve Hip Implant System components were approved for sale and marketing by the FDA through the 5l0(k) clearance process, whereby the components were represented to be substantially equivalent to a predicate, or previously cleared, medical device.

22.     Upon information and belief, the predicate device that Wright contends is substantially equivalent to the Conserve Hip Implant System is the same first-generation metal-on-metal hip implant that failed in the early 1970s.

23.     Upon information and belief, Wright marketed to patients with hip problems that, after being implanted with the Conserve Hip Systems, they could engage in and/or return to a normal, active lifestyle and other strenuous activities with "no limits." Wright marketed that its Conserve Hip Systems provided a greater range of motion than other hip implants.

24.     Prior to June 18, 2007, Mike began medical treatment for orthopedic conditions, including degenerative bone disease of the left hip, with Dr. Bruce Evans, M.D. ("Dr. Evans"), in Salt Lake City, Utah.

25.     Upon information and belief, Dr. Evans recommended the Conserve Hip Implant System for Mike's left total hip replacement based on information he received from Wright.

26.     Upon information and belief, Dr. Evans recommended the Conserve Hip Implant System to Mike because, among other reasons, he knew that he had very physically demanding job, working as a material handler at the Salt Lake City Airport FedEx ramp for over 20 years. That position required him to transport freight containers weighing between 2,000 and 7,000 pounds onto rollers which convey the containers to the airplanes prior to takeoff. Sometimes he even had to move freight form containers onto the airplanes manually.

6

27.     Mike decided to proceed with a total hip replacement of his left hip utilizing the Conserve Hip Implant System based on Dr. Evans's information from Wright and his recommendation.

28.     On June 18, 2007, Dr. Evans implanted the Conserve Hip Implant System into Mike's left hip at St. Mark's Hospital in Salt Lake City, Utah.

29.     Upon information and belief, prior to, on, and after June 18, 2007, Wright knew that the Conserve Hip Implant System was defective and harmful to patients and that its components had an unacceptable failure and complication rate. Wright had a legal obligation to stop selling the products and to notify physicians of the risks of failure and adverse reactions to metal debris generated by normal use of the Conserve Hip Implant System.

30.     In October 2019, Mike awoke with a severe pain in his hip and groin, radiating anteriorly. The pain was such that he was unable to work and scheduled an appointment with his doctor.

31.     He met with Dr. Evans on October 24, 2019. Dr. Evan explained to Mike for the first time that the hip that he was implanted with had been subject to recall and had had problems. Dr. Evans ordered x-rays and mCnc and Cobalt Bid-sCnc blood work.

32.     Dr. Evans met with Mike on January 14, 2020, to share with him the results of the tests and recommended next steps. The tests indicated abnormal levels of heavy metals in Mike's blood. Dr. Evans advised Mike that he would have to undergo a left hip revision surgery. The surgery was scheduled.

33.     However, before the surgery could occur, the hip failed. On January 23, 2020, Mike was at work when he felt a pop in his hip. The resulting pain disabled him, causing him to drop to the floor.

34.     He was taken to Intermountain Medical Center where an x-ray revealed that the Conserve Hip Implant System had failed, breaking at the junction of the modular neck trunnion. Ultimately, Mike was transferred to St. Mark's Hospital where Dr. O. Brant Nikolaus took over Mike's care.

35.     On Sunday, January 26, 2020, Mike underwent left hip revision surgery. The surgery was more difficult than expected and took much longer than the medical providers had anticipated. But Dr. Nikolaus confirmed that the Conserve Hip Implant System's modular neck had broken. However, the femoral implant was well fixed to the femur. The tool Wright Medical had designed and manufactured for such situations, failed to work as intended, breaking two drill bits in the attempts. Ultimately, a trochanteric osteotomy had to be performed to remove the femoral neck piece.

36.     Because of the extended time it took to perform the revision surgery, Mike suffered complications. He developed an elevated creatinine and CK levels. He also had severe pain and swelling in his right leg. Doctors later confirmed that he had rhabdomyolysis and acute kidney injury.

37.     Mike had to undergo dialysis five different times. Each time was distressing in light of the risk of infection to his new implant.

38.     The dialysis improved his creatinine levels, but did not alleviate his excruciating pain in his right leg and foot.

8

39.     After several weeks in the hospital, Mike was able to return home, but his recovery has been anything but smooth. He has continued to have rhabdomyolysis, which has led to peripheral neuropathy and chronic pain in his right leg and foot. This was ultimately diagnosed as complex regional pain syndrome.

40.     His ongoing treatment includes several medications, physical therapy, and lumbar sympathetic blocks. While these have mitigated Mike's symptoms, he continues to have flare-ups after activity.

41.     Mike was out of work for 28 weeks. And when he returned to work, he only worked part-time, but had to take a different position that did not impose the same physical demands of his prior position.

42.     Of course, Mike has been unable to help his large family and perform household duties as he did before. He has also been unable to do many of the activities he used to enjoy, including coaching little league and high school football. Hiking long distances or playing basketball are no longer an option for him.

43.     This has not only been painful and inconvenient, but damaging to his mental health. It has strained his relationship with his children and friends, but especially with his wife, Plaintiff Brodi Ika. And unfortunately, Mike's doctors are unable to tell him how long his condition will continue and have disappointed him with the possibility that the complex regional pain syndrome may never be cured.

## FIRST CLAIM FOR RELIEF
### (Strict Product Liability (Defective Design))

44.     Plaintiffs incorporate herein all other allegations in this Complaint.

9

45.     On and prior to June 18, 2007, Defendants were engaged in the business of designing, manufacturing, marketing, selling, and distributing orthopaedic hip implants and did design, manufacture, distribute, market, and sell the Conserve Hip Implant System implanted in Mike.

46.     Defendants each had a duty to place into the stream of commerce, manufacture, distribute, market, promote, and sell the Conserve Hip Implant System so that it and its component parts were neither defective nor unreasonably dangerous when put to the use for which they were designed, manufactured, distributed, marketed, and sold and for all foreseeable uses.

47.     Defendants sold, distributed, supplied, and/or promoted the Conserve Hip Implant System to Mike and his implanting physician.

48.     Wright expected the Conserve Hip Implant System that it was selling, distributing, supplying, manufacturing, and/or promoting to reach, and it did in fact reach, implanting physicians and consumers in the State of Utah, including Mike and his implanting physician, with no change in its condition from the time of its manufacture through its implantation.

49.     At the time the Conserve Hip Implant System left Defendants' possession and the time it entered the stream of commerce, it was in an unreasonably dangerous or defective condition. Its design defects included, but are not limited to, the following:

    a.   it was not reasonably safe as intended to be used;

    b.   it had an inadequate design for the purpose of hip replacement;

    c.   it contained unreasonably dangerous design defects, including an inherently unstable design which resulted in an unreasonably high probability of failure;

    d.   its design put the metal femoral ball directly in contact with the metal acetabular cup which produces metal-on-metal wear debris;

    e.   it had an unstable and defective design that results in a hip prosthesis which had risks that exceeded the benefits of the medical device;

    f.   its unstable and defective design resulted in a hip prosthesis that was more dangerous than the ordinary user would expect and that failed to perform as safely as an ordinary user would expect;

    g.   it failed to perform in a manner reasonably expected in light of its nature and intended function and subjected Mike to an unreasonable risk of harm beyond that contemplated by an ordinary use.

    h.   it was insufficiently tested; and

    i.   at the time it was designed, a safer alternative design was available that was technically and economically feasible under the circumstances.

50.    Mike used the Conserve Hip Implant System for its intended purpose, i.e., hip replacement, and in a manner reasonably foreseeable to Wright.

51.    As a direct and proximate result of one or more of the foregoing design issues, the Conserve Hip Implant System proximately caused Mike to suffer and sustain injuries. Additionally, these design issues have directly and proximately caused and continue to cause Mike to endure pain and suffering in body and mind. The design defects alleged herein have and will also continue to cause Mike to incur expense and loss of opportunities in his efforts to treat

his injuries. Mike has lost and will continue to lose income because of his injuries. He has been and will be unable to attend to his normal affairs and duties.

52.     In addition, the defective and unreasonably dangerous nature of the Wright Conserve Hip Implant System is, at the very least, the result of conduct that manifests a knowing and reckless indifference toward, and a disregard of, the rights of others. Accordingly, pursuant to Utah Code § 78B-8-201, Mike is entitled to an award of punitive damages.

**SECOND CLAIM FOR RELIEF**
**(Strict Product Liability (Warnings Defect/Failure to Warn))**

53.     Plaintiffs incorporate herein all other allegations in this Complaint.

54.     Defendants were required to warn about any danger from the Conserve Hip Implant System's foreseeable use of which they knew or should have known. Defendants knew or should have known and warned Mike and/or his implanting surgeon about the following dangers, among others:

    a.   The Conserve Hip Implant System design puts the metal femoral ball directly in contact with the metal acetabular cup, resulting in the production of metal-on-metal wear debris;

    b.   The amount of metal-on-metal wear debris generated increases with a patient's activity level;

    c.   Patients can have adverse reactions to metal debris, including but not limited to osteolysis and inflammation, resulting from foreseeable use of the Conserve Hip Implant System;

    d.   The Cobalt-Chromium wear debris, corrosion and metal ions resulting from foreseeable use of the Conserve Hip Implant System are toxic and can cause

12

adverse local tissue reactions, inflammation, and failure of the Conserve Hip
Implant System;

e. The Conserve Hip Implant System warnings did not disclose that the device was
inadequately tested or that Wright failed to test the effects of Cobalt-Chromium
metal debris on human tissues;

f. The Conserve Hip Implant System warnings failed to convey adequate post-
marketing warnings regarding the risk, severity, scope, and/or duration of the
dangers posed by the device; and

g. The Conserve Hip Implant System warnings failed to alert consumers to the
dangers it posed and failed to give them the information necessary to avoid or
mitigate those dangers.

55.     The warnings to Mike and his implanting physician about the dangers the
Conserve Hip Implant System posed to consumers were inadequate and were diluted and
contradicted by its marketing materials.

56.     In addition, the Instructions for Use for the Conserve Hip Implant System was a
generic set of instructions for all of its hip prostheses and did not warn about specific metal-on-
metal issues.

57.     Wright, as designer, manufacturer, marketer and distributor of medical devices
are held to the level of knowledge of an expert in its field.

58.     Mike and his implanting physician did not have substantially the same knowledge
as the Conserve Hip Implant System's designer, manufacturer or distributor: Wright.

13

59.     For the reasons noted above, Wright failed to provide an adequate warning at the time the Conserve Hip Implant System was manufactured, distributed, and sold (and implanted).

60.     Wright's failure to provide an adequate warning made the Conserve Hip Implant System defective and unreasonably dangerous.

61.     The lack of adequate warning proximately caused Mike to suffer and sustain injuries. Additionally, the inadequate warnings have caused and continue to cause Mike to endure pain and suffering in body and mind. The design defects alleged herein have and will also continue to cause Mike to incur expense and loss of opportunities in his efforts to treat his injuries. Mike has lost and will continue to lose income because of his injuries. He has been and will be unable to attend to his normal affairs and duties.

62.     In addition, Wright's defective and inadequate warnings are, at the very least, the result of conduct that manifests a knowing and reckless indifference toward, and a disregard of, the rights of others. Accordingly, pursuant to Utah Code § 78B-8-201, Mike is entitled to an award of punitive damages.

## THIRD CLAIM FOR RELIEF
### (Negligence/Gross Negligence)

63.     Plaintiffs incorporate herein all other allegations in this Complaint.

64.     At all relevant times, Wright had a duty to exercise due care in designing, testing, manufacturing, distributing, marketing, promoting, and selling the Conserve Hip Implant System such that it would be reasonably safe for its intended use.

65.     Wright breached its duty to Mike in the designing, testing, manufacturing, distributing, marketing, promoting, selling, and failing to provide adequate warnings regarding the Conserve Hip Implant System, as alleged herein.

66.     Wright knew or had reason to know that Mike, as a member of the general public for whose use the Conserve Hip Implant System was placed into interstate commerce, would be likely to use the Conserve Hip Implant System in the manner described in this Complaint.

67.     Wright knew or reasonably should have known of the danger associated with the manner and circumstances of Mike's foreseeable use of the Conserve Hip Implant System, which dangers would not be obvious to a reasonable consumer who Wright expected to use the Conserve Hip Implant System.

68.     Wright failed to exercise reasonable care in its design and testing of, and warnings for, the Conserve Hip Implant System. Wright's negligence and gross negligence caused Mike to suffer and sustain injuries. Additionally, Wright's negligence and gross negligence have caused and continue to cause Mike to endure pain and suffering in body and mind. The design defects alleged herein have and will also continue to cause Mike to incur expense and loss of opportunities in his efforts to treat his injuries. Mike has lost and will continue to lose income because of his injuries. He has been and will be unable to attend to his normal affairs and duties.

### FOURTH CLAIM FOR RELIEF
### (Breach of Implied Warranties)

69.     Plaintiffs incorporate herein all other allegations in this Complaint.

70.     At the time of the sale of the Conserve Hip Implant System to and its implantation in Mike, Wright was in the business of selling hip implant systems.

71.     Wright, as designers, manufacturers, marketers and distributors of hip-implant devices, held itself out as having special knowledge or skill regarding hip implants and expert in their field.

72.     The Conserve Hip Implant System, at the time of its sale to Mike, was not reasonably fit for the ordinary purposes for which hip implants are used.

73.     Wright had reason to know that Mike was buying the Conserve Hip Implant System for the particular purpose of hip replacement surgery and that he was relying on Wright's skill or judgment to select or furnish a suitable hip implant.

74.     The Conserve Hip Implant System was defective, and its condition rendered it defective and unreasonably dangerous, as described above, and unfit for the particular purpose for which Mike purchased it.

75.     As a result of the defective nature of the Conserve Hip Implant System and its failure to comply with the implied warranties of merchantability and fitness for a particular purpose, Mike has been and will continue to be harmed, including pain and suffering in body and mind, past and future medical expenses, lost income, and his inability to attend to his normal affairs and duties.

## FIFTH CLAIM FOR RELIEF
### (Intentional Misrepresentation)

76.     Plaintiffs incorporate herein all other allegations in this Complaint.

77.     Upon information and belief, at the time Mike was evaluating which hip implant to utilize for his hip, Wright, through its sales representatives and distributors, represented to Mike's prescribing physician Dr. Evans that the Conserve Hip Implant System was vetted, FDA-cleared, safe and effective, designed for more active patients, and would return the patient to a more active lifestyle, which other hip-replacement systems could not do, and that no data was available as to any deleterious effects in patients with metal-on-metal hip replacements.

78.     Upon information and belief, Wright failed to follow appropriate regulatory pathways to market component parts of the Conserve Hip Implant System. Indeed, upon information and belief, Wright used a letter to file process to proceed to market the device, which violated FDA requirements.

79.     Upon information and belief, Wright utilized misrepresentations that contradicted its own knowledge regarding activity levels and metal ions to drive sales of the Conserve Hip Implant System. Despite knowing that increased activity would lead to increased wear, Wright directed its marketing (via websites, journal ads, brochures, pamphlets, testimonials, endorsements, newspaper articles, and other means) to surgeons and more active consumers who wanted to return to physical activity.

80.     Upon information and belief, Wright instructed its sales personnel, contrary to its own knowledge, that the effects of metal ion release are known and have been demonstrated to be safe and had surgeon consultants promote that its A-Class metal reduced wear and generated fewer metal ions.

81.     However, the above statements and representations were untrue.

82.     Upon information and belief, Wright knew its representations were untrue or made these representations recklessly, knowing that it lacked sufficient knowledge upon which to base such representations.

83.     Wright made these representations for the purpose of inducing orthopaedic surgeons, including Dr. Evans, Mike's implanting surgeon, and patients like Mike to act upon the representations and select the Conserve Hip Implant System for implantation.

84.     Dr. Evans, acting reasonably and in ignorance of the falsity of Wright's representations, did in fact rely on Wright's representations, and thereby recommended the Wright Conserve Hip Implant System for implantation into Mike's left hip.

85.     Mike, acting reasonably and in ignorance of the falsity of Wright's representations, relied upon Dr. Evan's recommendation and agreed to have the Wright Conserve Hip Implant System implanted into his hip.

86.     The implantation of the Wright Conserve Hip Implant System has caused Mike to suffer and sustain injuries. Additionally, the defective implant has caused and continues to cause Mike to endure pain and suffering in body and mind. The defective implant has caused and will continue to cause Mike to incur expense and loss of opportunities in his efforts to treat his injuries. Mike has lost and will continue to lose income because of his injuries. He has been and will be unable to attend to his normal affairs and duties.

87.     In addition, Wright's misrepresentations, as alleged herein are, at the very least, the result of conduct that manifests a knowing and reckless indifference toward, and a disregard of, the rights of others. Accordingly, pursuant to Utah Code Ann. § 78B-8-201, Mike is entitled to an award of punitive damages.

## SIXTH CLAIM FOR RELIEF
### (Fraudulent Concealment/Non-Disclosure)

88.     Plaintiffs incorporate herein all other allegations in this Complaint.

89.     Wright, as designers, manufacturers, marketers and distributors of hip-implant devices, held itself out as having special knowledge or skill regarding hip implants and expert in its field.

4847-6620-3389.v1

90.     Due to Wright's expertise, and its relationship with implanting physicians, including Dr. Evans, it had a duty to disclose important facts to consumers of its Conserve Hip Implant Systems and to patients considering or already having a Conserve Hip Implant System, including Mike.

91.     As described in detail above, upon information and belief, Wright knew that its Conserve Hip Implant System was defective and unreasonably dangerous, that, upon information and belief, it lacked authority to market the Conserve Hip Implant System, and that its Conserve Hip Implant System was not appropriate for use in active patients like Mike.

92.     Yet, Wright failed to disclose these important facts to Mike or his implanting physician.

93.     Neither Mike nor his implanting physician knew that the Conserve Hip Implant System was defective or unreasonably dangerous, that it may have been illegally marketed or sold, that elevated Chromium and Cobalt ions had deleterious effects, or that the Conserve Hip Implant System was not appropriate for use in active patients like Mike.

94.     Wright's failure to disclose these important facts was a substantial factor in causing Mike's injuries because had his implanting physician known these important facts, he would not have recommended the Conserve Hip Implant System for Plaintiffs total hip replacement.

95.     Moreover, had Mike known these important facts, he would not have agreed to have the Conserve Hip Implant System implanted.

96.     Wright's fraudulent concealment and non-disclosures were a substantial factor in causing Mike's damages, including pain and suffering in body and mind, past and future medical expenses, loss of income, and his inability to attend to his normal affairs and duties.

97.     In addition, Wright's fraudulent concealment and non-disclosures are, at the very least, conduct that manifests a knowing and reckless indifference toward, and a disregard of, the rights of others. Accordingly, pursuant to Utah Code Ann. § 78B-8-201, Mike is entitled to an award of punitive damages for Wright's fraudulent concealment and non-disclosures.

**SEVENTH CLAIM FOR RELIEF**
**(Negligent Misrepresentation)**

98.     Plaintiffs incorporate herein all other allegations in this Complaint.

99.     As alleged herein, at the time Mike and his implanting physician were evaluating which hip implant to use for his replacement surgery, Wright, via its sales representatives and distributors, represented to Mike and his implanting physician that the Conserve Hip Implant System was designed for a more active lifestyle, was safe and effective, was cleared for marketing by the FDA, and would last longer than other hip-replacement systems.

100.    As of June 18, 2007, Wright should have known that the Conserve Hip Implant System was defective, dangerous in active individuals, may have been illegally marketed and sold, and was not appropriate for use in active patients because increased activity caused increased wear, increased metal particles and metal ions, and increased events of failure.

101.    Wright should have known that its representations were false or made these representations recklessly, knowing that it lacked sufficient knowledge upon which to base such representations.

102.    Wright made these representations for the purpose of inducing Mike and his implanting surgeon (and others) to act upon the representations and agree to or recommend the implantation of the Conserve Hip Implant System.

103.    Mike and his implanting surgeon, Dr. Evans, acted reasonably and in ignorance of the falsity of Wright's representations and relied on Wright's representations, and were thereby induced to recommend and agree to the implantation of the Wright Conserve Hip Implant System in Mike's left hip.

104.    But for Wright's representations, Dr. Evans would not have selected and recommended the Conserve Hip Implant System for use in Mike's left hip replacement, and but for Wright's representations, Mike would not have agreed to have the Conserve Hip Implant System implanted.

105.    Due to Mike's and his implanting surgeon's reliance on Wright's representations, Mike was proximately caused to endure pain and suffering in body and mind, past and future medical expenses, lost income, and an inability to attend to his normal affairs and duties.

106.    In addition, Wright's negligent misrepresentations are manifest, at the very least, a knowing and reckless indifference toward, and a disregard of, the rights of others. Accordingly, pursuant to Utah Code Ann. § 78B-8-201, Mike is entitled to an award of punitive damages for Wright's misrepresentations.

### EIGHTH CLAIM FOR RELIEF
**(Consumer Sales Practices Act, Utah Code § 13-11-1, et seq.)**

107.    Plaintiffs incorporate herein all other allegations in this Complaint.

108.    By selling and supplying Conserve Hip Implant Systems for implantation into consumers like Mike, Wright is a "supplier," as defined by Utah Code § 13-11-3(6).

21

109.    The sale of the Conserve Hip Implant System for implantation into Mike was a sale of goods to a person for his own personal use, and thus was a "consumer transaction" under Utah Code § 13-l l-3(2)(a).

110.    Wright indicated, knowingly or intentionally, that the Conserve Hip Implant System has certain performance characteristics, uses, or benefits, or that it was particular standard or quality, including: that it would provide a larger angle of coverage than other hip-replacement systems, that no data was available as to any deleterious effects of elevated Cobalt and Chromium ions that had been detected in patients with metal-on-metal hip replacements, that the Conserve Hip Implant System and its components were FDA-cleared for marketing, and that the Conserve Hip Implant System was appropriate for use in active patients. The Conserve Hip Implant System does not, in fact, have such characteristics, uses or benefits and is not of the described standard or quality.

111.    Wright's indications in regard to the Conserve Hip Implant System's performance characteristics, uses or benefits violated Utah Code § 13-11-4(2)(a) and (b).

112.    Mike brings this case as a consumer who has suffered a loss as a result of Wright's violations of the Utah Consumer Sales Practices Act.  Because his actual damages exceed $2,000, he is entitled to recover his actual damages, which include all of his past and future medical costs relating to the revision of left hip replacement, plus court costs under Utah Code § 13-11-19(2).

113.    Additionally, Mike also intends to seek his reasonable attorneys' fees Utah Consumer Sales Practices Act. *See* Utah Code §13-11- 19(5).

<u>**NINTH CLAIM FOR RELIEF**</u>
**(Loss of Consortium)**

114.     Plaintiffs incorporate herein all other allegations in this Complaint.

115.     As a result of Wright's conduct as alleged herein, Mike has suffered a significant and likely permanent injury that has substantially changed his lifestyle.

116.     Mike was legally married to his spouse, Plaintiff Brodi Ika, under the laws of Utah at the time of his injury.

117.     As a proximate cause of the injuries to Mike, Plaintiff Brodi Ika has experienced a loss of the benefits that one spouse expects to receive from the other, including companionship, cooperation, affection, aid, and sexual relations.

118.     Plaintiff Brodi Ika is entitled to recover for her loss of consortium in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that the Court grant relief in their favor, and against Wright, including a judgment against each of them in an amount to be determined at trial, but in no event less than $300,000.00, plus interest pursuant to Utah Code § 78B-5-824, punitive damages pursuant to Utah Code Ann. § 78B-8-201, reasonable attorneys' fees as permitted by law, and any other relief the Court deems equitable and just.

## **JURY DEMAND**

Pursuant to Rule 38 of the Utah Rules of Civil Procedure, Plaintiff requests that a trial by jury be held for any issue triable of right by a jury.

DATED this 30th day of September, 2021.

KIRTON McCONKIE

By: s/  Adam D. Wahlquist
Rod N. Andreason

4847-6620-3389.v1

Adam D. Wahlquist
*Attorneys for Plaintiffs*

4847-6620-3389.v1

3RD DISTRICT COURT
SALT LAKE COUNTY, STATE OF UTAH


MAIKOLO IKA et al. vs. WRIGHT MEDICAL GROUP INC et al.
CASE NUMBER 210905289 Product Liability
_____

CURRENT ASSIGNED JUDGE
        HEATHER BRERETON

PARTIES
        Plaintiff - MAIKOLO IKA
        Represented by: ADAM WAHLQUIST
        Represented by: ROD ANDREASON

        Plaintiff - BRODI IKA
        Represented by: ADAM WAHLQUIST
        Represented by: ROD ANDREASON


        Defendant - WRIGHT MEDICAL GROUP INC


        Defendant - WRIGHT MEDICAL TECHNOLOGY INC


ACCOUNT SUMMARY
            Total Revenue Amount Due:        625.00
                        Amount Paid:         625.00
                      Amount Credit:           0.00
                            Balance:           0.00
        REVENUE DETAIL - TYPE: COMPLAINT 10K-MORE
                 Original Amount Due:        375.00
                  Amended Amount Due:        375.00
                        Amount Paid:         375.00
                      Amount Credit:           0.00
                            Balance:           0.00

        REVENUE DETAIL - TYPE: JURY DEMAND - CIVIL
                 Original Amount Due:        250.00
                  Amended Amount Due:        250.00
                        Amount Paid:         250.00
                      Amount Credit:           0.00
                            Balance:           0.00


CASE NOTE


PROCEEDINGS
09-30-2021   Filed: Complaint
09-30-2021   Case filed by efiler
09-30-2021   Fee Account created Total Due: 375.00
09-30-2021   Fee Account created
09-30-2021   Fee Account created Total Due: 250.00

```
09-30-2021   Fee Account created
09-30-2021   COMPLAINT 10K-MORE  375.00
09-30-2021   JURY DEMAND - CIVIL  250.00
09-30-2021   Judge HEATHER BRERETON assigned.
09-30-2021   Note: discovery tier set to 3
09-30-2021   Filed: Return of Electronic Notification
```